UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAC S. HUDSON, et al.,
      Plaintiffs,

      v.                                      CIVIL ACTION NO.
                                              11-12173-NMG

LUIS SPENCER, et al.,
      Defendants.

**REPORT AND RECOMMENDATION RE:**
**MOTION FOR JUDGMENT BY DEFAULT OR ALTERNATIVELY MOTION TO COMPEL**
**AN ANSWER TO THE COMPLAINT (DOCKET ENTRY # 38) AND MOTION TO**
**DISMISS (DOCKET ENTRY # 31)**

**MEMORANDUM AND ORDER RE:**
**MOTION TO STAY THE MOTION TO DISMISS UNTIL THE OUTCOME OF THE**
**MOTION FOR JUDGMENT BY DEFAULT OR ALTERNATIVELY MOTION TO COMPEL**
**AN ANSWER TO THE COMPLAINT**
**(DOCKET ENTRY # 39)**

**July 31, 2013**

**BOWLER, U.S.M.J.**

      Pending before this court are:  (1) a motion to dismiss

(Docket Entry # 31); (2) a motion for judgment by default or

alternatively a motion to compel an answer to the complaint

(Docket Entry # 38); and (3) a motion to stay the motion to

dismiss until the outcome of the motion for judgment by default

or alternatively a motion to compel an answer to the complaint

(Docket Entry # 39).

PROCEDURAL BACKGROUND

      On December 8, 2011, plaintiffs Mac Hudson ("plaintiff

Hudson"), Faradan Salahuddin, Edgar Rock ("plaintiff Rock"),

Raymond Colon ("plaintiff Colon"), Abdul Lopez ("plaintiff Lopez"), Ralph Brown ("plaintiff Brown") and Evans Mahon ("plaintiff Mahon") (collectively "plaintiffs"), all inmates at the Massachusetts Correctional Institute in Concord, Massachusetts ("MCI Concord"), filed a one count complaint that includes a number of causes of action.[1]  (Docket Entry # 1). Plaintiffs observe the religious practices of the Nation of Islam ("NOI").  (Docket Entry # 1-1).

Count One alleges that defendants Luis Spencer, Christopher Mitchell, Bruce Gelb ("defendant Gelb"), Karen Dinardo ("defendant Dinardo"), Christine Larkin ("defendant Larkin") and Lois Russo ("defendant Russo") (collectively "defendants") violated:  (1) plaintiffs' rights under the First and Fourteenth Amendments under 42 U.S.C. § 1983 ("section 1983"); (2) the Religious Land Use and Institutionalized Persons Act under 42 U.S.C. § 2000cc-1(a); (3) Massachusetts General Laws chapter 93, section 102; (4) Massachusetts General Laws chapter 127, section 88; (5) articles I and XII of the Massachusetts Declaration of Rights; and (6) Title 103 of the Code of Massachusetts Regulations, sections 471.07(1)(a)(d) and 471.09(4)(6) ("Section 471.09").  (Docket Entry # 1, pp. 7 & 8).

---

[1]   At the time of the filing the complaint, Keon Godfrey, John Hullums, James Bell, Michael Perez and James Ellerbe were also plaintiffs but were later dismissed pursuant to a court order. (Docket Entry ## 1-1 & 16).

Plaintiffs seek both a declaratory judgment stating that defendants' actions violated the foregoing statutes and regulations as well as a court order for defendants to provide plaintiffs with their requested religious practices and items. (Docket Entry # 1, pp. 8 & 9).  Plaintiffs also seek compensatory and punitive damages as well as whatever relief this court deems fit.  (Docket Entry # 1, p. 9).

Defendants filed multiple motions for extension of time to answer the complaint.  (Docket Entry ## 22 & 29).  The district judge ultimately extended the deadline to February 12, 2013. (Docket Entry ## 23 & 30).

On February 12, 2013, defendants filed the motion to dismiss as well as a memorandum in support.  (Docket Entry ## 31 & 32).  Defendants allege that:  (1) plaintiffs did not "exhaust their administrative remedies pursuant to 42 U.S.C. § 1997e(a)," the Prison Litigation Reform Act ("PLRA"), or pursuant to Massachusetts General Laws chapter 127, section 38F; (2) the Eleventh Amendment bars section 1983 suits against defendants "in their official capacity"; (3) plaintiffs' section 1983 claim "fails to allege sufficient facts or omissions to support their [section 1983] claim against all defendants"; (4) "defendants are entitled to qualified immunity"; and (5) "providing only one full-time Muslim Imam per correctional facility does not violate the first amendment."  (Docket Entry # 32).

3

On March 5, 2013, the district judge extended plaintiffs'
time to file a response or reply to the motion to dismiss to
March 18, 2013.  (Docket Entry # 37).  Plaintiffs did not file a
response or reply to the motion to dismiss.

On March 25, 2013, plaintiffs filed a "motion for judgement
by default or alternatively compell defendants to answer the
complaint."  (Docket Entry # 38) (spelling in original).[2]
Plaintiffs allege that the motion to dismiss and the memorandum
in support of the motion do not constitute an "'original answer'
to the original complaint within the meaning of
Fed.R.Civ.Pro.7(a)(2)."  (Docket Entry # 38, p. 2).  Plaintiffs
allege that, "Absent the answer to complaint, Plaintiffs cannot
assess Defendants present motion to dismiss nor can this Court
properly assess either responses fairly."  (Docket Entry # 38,
p. 2).  Therefore, plaintiffs request the district judge to
"enter a judgement of default against Defendants for failure to
answer the complaint or alternatively compell Defendants to
answer."  (Docket Entry # 38, p. 1) (spelling in original).
Also on March 25, 2013, plaintiffs filed the above styled motion
to stay (Docket Entry # 39) the motion to dismiss until the

---

[2]   Unless otherwise noted, all direct quotations reflect the
grammar, capitalizations and punctuation in the originally
quoted material.  Only spelling errors are expressly identified
as such for all the direct quotations.

outcome of their motion for judgment by default or alternatively the motion to compel defendants to answer the complaint.

<u>FACTUAL BACKGROUND</u>[3]

On January 14, 2011, the first of a series of plaintiffs' grievances was filed by plaintiff Hudson with MCI Concord's Department of Correction ("DOC").  (Docket Entry # 1-1, p. 22). Plaintiff Hudson stated, "I seek space accommodation to observe my religious dictates ie study group, fruit of islam religious training, obligatory prayer, which is distinctly different than sunni islam practices."  (Docket Entry # 1-1, p. 22).  Plaintiff Hudson continued, "Presently similar situationed NOI muslims in DOC custody are afforded space accommodations . . .."  (Docket Entry # 1-1, p. 22).

On January 24, 2011, plaintiff Hudson received notice from Rachel Goguen ("Goguen"), a correctional program officer at MCI Concord, that his grievance had been partially approved. (Docket Entry # 1-1, p. 22).  Goguen explained that, "There is currently a [NOI] leader assigned to MCI Concord."  (Docket Entry # 1-1, p. 22).  Goguen further explained that, "Space has been identified and is in use for [NOI] practices."  (Docket Entry # 1-1, p. 22).  The notice also stated that, "Denied

---

[3]   In accordance with the standard of review afforded to a Rule 12(b)(6) motion to dismiss, detailed infra, the factual background is taken from the complaint and the documents attached to the complaint.

grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision." (Docket Entry # 1-1, p. 22).

On January 31, 2011, plaintiff Hudson wrote a letter to the director of treatment at MCI Concord, defendant Larkin, in which he referenced a conversation he had with defendant Larkin three days earlier.  (Docket Entry # 1-1, p. 21).  Plaintiff Hudson wrote, "You indicated that you would review the schoolroom schedule list to determine when more time could be provided to allow NOI tenants."  (Docket Entry # 1-1, p. 21) (spelling in original).  Plaintiff Hudson explained that, "NOI has its own belief and practices that are completely distinguishable from the orthodox wahhabism sunni practice observed by the full time Imam employed here."  (Docket Entry # 1-1, p. 21).  Plaintiff Hudson stated that, "I am being subjected to wahhabism teachings . . .."  (Docket Entry # 1-1, p. 21).  Plaintiff Hudson submitted that, "No other religious group is subjected to the same treatment."  (Docket Entry # 1-1, p. 21).

On March 11, 2011, defendant Larkin responded to plaintiff Hudson's letter in a letter of her own.  The letter informed plaintiff Hudson that she had denied his request "because [NOI] is already provided adequate space on a weekly basis."  (Docket Entry # 1-1, p. 24).  Defendant Larkin added, "If you are requesting extra study time you can sign up with the Imam who is

equipped to handle all requests under the Islam religion."
(Docket Entry # 1-1, p. 24).

On March 14, 2011, plaintiff Hudson sought clarification of
defendant Larkin's letter, stating in another letter to
defendant Larkin that, "The nature of my complaint which is that
the available Islamic services does not adhere to the tenents
expressed by Shia nor NOI muslims . . .."  (Docket Entry # 1-1,
p. 25) (spelling in original).  Plaintiff Hudson further
explained that the Islamic services offered at MCI Concord are
"centered on wahhabism belief that does not recognize myself or
other Muslims as Muslims."  (Docket Entry # 1-1, p. 25).
Plaintiff Hudson added, "Your response compells being subject to
a set wahhabism belief that are inconsistent with my own."
(Docket Entry # 1-1, p. 25) (spelling in original).

On March 14, 2011, plaintiff Hudson also wrote defendant
Dinardo, the deputy superintendent at MCI Concord, and attached
the March 14, 2011 letter to defendant Larkin.  (Docket Entry #
1-1, pp. 27 & 28).  Plaintiff Hudson cited provisions of the
Code of Massachusetts Regulations and added that his requests in
the letter to defendant Larkin "are in line with the regulatory
provisions which clearly [state] that these accommodations
should be provided upon request."  (Docket Entry # 1-1, pp. 27 &
28).

Also on March 14, 2011, plaintiff Hudson wrote a letter to defendant Gelb, the superintendant at MCI Concord, enclosing the March 14, 2011 letters to both defendant Larkin and to defendant Dinardo. (Docket Entry # 1-1, p. 29). Plaintiff Hudson thanked defendant Gelb for his time and attention to the matters addressed in the letters to defendant Larkin and to defendant Dinardo and pointed out that he was "expecting a timely response . . .." (Docket Entry # 1-1, p. 29).

On March 16, 2011, plaintiff Hudson wrote another letter to defendant Larkin in which he requested "lockers storage and cabinets to store religious videos and books." (Docket Entry # 1-1, p. 30). Plaintiff Hudson made the request pursuant to Section 471.09. (Docket Entry # 1-1, p. 30). Plaintiff Hudson also sought "a designated clerk's position for the NOI to assist Minister Randy Muhhamad in handling confidential material." (Docket Entry # 1-1, p. 30).

On March 25, 2011, defendant Gelb responded to plaintiff Hudson's letter dated March 14, 2011. (Docket Entry # 1-1, p. 31). Defendant Gelb informed plaintiff Hudson that defendant Larkin's March 11, 2011 denial of the initial grievance was "based on the commonly accepted practices noted in [the DOC's Religious Services Handbook]" ("the handbook"). (Docket Entry # 1-1, p. 31). Defendant Gelb continued, "If in fact you wish to request access to practices not addressed in the handbook the

proper way to address this is by submitting a request to the Religious Service Review Committee." (Docket Entry # 1-1, p. 31). Defendant Gelb also stated, "I have included a Religious Services Request form for you to complete." (Docket Entry # 1-1, p. 31). Defendant Gelb then informed plaintiff Hudson that the committee, which meets quarterly, would be meeting the first week of April and that defendant Gelb would review the form and submit it in advance of the April meeting if plaintiff Hudson could complete the form in time. (Docket Entry # 1-1, p. 31).

On March 31, 2011, plaintiff Hudson responded by letter to defendant Gelb's suggestion that plaintiff Hudson could submit a request to the religious services review committee. (Docket Entry # 1-1, p. 32). Plaintiff Hudson wrote that, "the request to Jumah services for NOI and study group time during the week is specifically mention[ed] in the [handbook] on page. 74." (Docket Entry # 1-1, p. 32). Plaintiff Hudson continued, "In addition [the handbook] also states: Allocation of time and space should reflect reasonable accommodations and availability of resources to enable the practices of all religion." (Docket Entry # 1-1, p. 32). Plaintiff Hudson submitted that, "other institutions operating under the [DOC] . . . made time for weekly study including [separate] Jumah." (Docket Entry # 1-1, p. 32). Further, plaintiff Hudson noted, "These accommodations [were] not sanctioned by the Religious Committee but by the

[superintendent] of that facility."  (Docket Entry # 1-1, p. 32).  Plaintiff Hudson concluded by asking, "Can you please inform me what appears to be the real problem with fulfilling the request?"  (Docket Entry # 1-1, p. 32).

On April 21, 2011, plaintiff Colon wrote a letter to defendant Larkin which read, "Please consider the instant as my request for additional class-room time to adhere to NOI Study Groups."  (Docket Entry # 1-1, p. 56).  Plaintiff Colon added, "It is common standard procedure for followers . . . to adhere to the Principles of AL-JUMU'AH, Main Lecture Service, Fruit Class, and Study Groups."  (Docket Entry # 1-1, p. 56).  Plaintiff Colon explained further that, "While I was at MCI-OLD COLONY, as long as there was security readily available, we were allowed to adhere to the Principles of our faith."  (Docket Entry # 1-1, p. 56).  Plaintiff Colon concluded by stating that he was "requesting an increase in time allotment that would be compatible with the H-Building schedule, so long as there is readily available staff-security of course."  (Docket Entry # 1-1, p. 56).

On June 15, 2011, plaintiff Hudson filed a second grievance with the DOC.  (Docket Entry # 1-1, p. 34).  Plaintiff Hudson complained that, "Since I've been here it appears that the kitchen Lt. Infante & some other have engaged in a pattern that is tantamount to harassing muslims accepting Halal meals."

(Docket Entry # 1-1, p. 34).  Plaintiff Hudson alleged that "Lt. Infante" informed him that "he would prevent Halal meals from being served juice containers."  (Docket Entry # 1-1, p. 34). Plaintiff Hudson added, however, that the juices continued to arrive "frozen so that they are undrinkable."  (Docket Entry # 1-1, p. 34).  Plaintiff Hudson also alleged a conflict arises between staff and inmates who wish to be served Halal meals due to the "arbitrary" process by which sign up sheets for each meal are released.  (Docket Entry # 1-1, p. 34).  Plaintiff Hudson explained that this process leads to inmates being "marked as a refusal by staff" when inmates choose not to show up to meals which do not offer their preferred food.  (Docket Entry # 1-1, p. 34).  This occurs despite the fact that "showing up to each meal isn't mandatory."  (Docket Entry # 1-1, p. 34).  Finally, plaintiff Hudson alleged that, "special diets are called with other units purposely to create long lines to discourage special diets . . . or . . . meals are served cold."  (Docket Entry # 1-1, p. 34).  Plaintiff Hudson concluded by saying, "I want the discriminatory conduct to cease."  (Docket Entry # 1-1, p. 34).

On June 25, 2011, plaintiff Hudson filed a third grievance with the DOC.  (Docket Entry # 1-1, p. 36).  Plaintiff Hudson alleged he "was prevented from meeting with minister Randy (Muhammed) Curet by Sgt. Montero assigned to the lower H-building area."  (Docket Entry # 1-1, p. 36).  Plaintiff Hudson

claimed that Sergeant Montero informed plaintiff Hudson that he
could not enter the building until after the building opened at
1:00 p.m.  (Docket Entry # 1-1, p. 36).  Then, plaintiff Hudson
alleged he told Sergeant Montero that he entered the building
"this way" weekly.  (Docket Entry # 1-1, p. 36).  Plaintiff
Hudson stated that Sergeant Montero then let plaintiff Hudson
into the building to wait for the minister but would not permit
plaintiff Hudson to enter the minister's office even after the
minister informed Sergeant Montero why plaintiff Hudson was
there.  (Docket Entry # 1-1, pp. 36 & 38).  Plaintiff Hudson
further claimed that Sergeant Montero then told plaintiff Hudson
to return to his unit.  (Docket Entry # 1-1, p. 36).  Plaintiff
Hudson asserted that such treatment "violated [his] 1st
amendment rights to seek religious [counseling]."  (Docket Entry
# 1-1, p. 36).

On July 18, 2011, plaintiff Hudson received notice from the
institutional grievance coordinator, Keith Scannell
("Scannell"), that the June 25, 2011 grievance regarding
building entry was denied because the building was closed and
not open for inmate use at the time plaintiff Hudson tried to
enter.  (Docket Entry # 1-1, p. 36).  Scannell explained, "You
are allowed to visit with the minister during normal operations
of the building."  (Docket Entry # 1-1, p. 36).  The notice
informed plaintiff Hudson that, "Denied grievances may be

appealed to the Superintendent within 10 working days of
Institution Grievance Coordinator's decision."  (Docket Entry #
1-1, p. 36).

On July 18, 2011, plaintiff Hudson immediately appealed the
denial of the June 25, 2011 grievance related to the building
entry.  (Docket Entry # 1-1, p. 38).  Plaintiff Hudson alleged
that the building was open and that any finding to the contrary
was "arbitrary based on protecting the [sergeant] in question at
the expense of adhering to the prison's own policies/[practices]
as well as my religious rights."  (Docket Entry # 1-1, p. 38).

On July 27, 2011, plaintiff Hudson received notice from
Scannell that the June 15, 2011 grievance alleging
discrimination related to food service had been partially
approved.  (Docket Entry # 1-1, p. 37).  Scannell explained that
if the juice was served frozen he may "request a replacement."
(Docket Entry # 1-1, p. 37).  Scannell also stated that "the
serving of special diets will [be] monitored more closely . .
.."  (Docket Entry # 1-1, p. 37).  Finally, the notice informed
plaintiff Hudson that, "Denied grievances may be appealed to the
Superintendent within 10 working days of Institution Grievance
Coordinator's decision."  (Docket Entry # 1-1, p. 37).

On August 9, 2011, plaintiff Hudson received notice from
defendant Gelb that his appeal regarding building entry to meet
with the minister had been denied.  (Docket Entry # 1-1, p. 38).

13

Defendant Gelb explained that the minister was informed he could meet with inmates in other locations during the day but that "all scheduled appointments should be conducted between the hours of 1-4:00 p.m. in H-bldg. on Wednesday." (Docket Entry # 1-1, p. 38).

On August 29, 2011, plaintiff Brown filed an initial grievance with the DOC. (Docket Entry # 1-1, p. 59). Plaintiff Brown alleged he was "being denied the right to worship as [NOI] Muslim." (Docket Entry # 1-1, p. 59). Plaintiff Brown alleged he was also being denied "adequate space and time to have study group Jumah as taught by the Honorable Elijah Muhammad and a full time minister employed to provide: religious training, one on one consultation, and mandatory [NOI] observances." (Docket Entry # 1-1, p. 59). Plaintiff Brown continued that he was allowed a single two hour service a week, which was insufficient, "[w]hile other religious operation religious groups are afforded [plaintiff Brown's requested] abilities in accordance with 103 CMR 471.07 (1)(a)(c)(d); 08(1)(2)(7)(a)(b) (c)(d)(e)(f), 09(1)(2)(3)(4)(6)." (Docket Entry # 1-1, p. 59). Plaintiff Brown concluded that, "This violated my 1st amendment rights and 14th amendment to the U.S. Constitution and article 1 to the Massachusetts Declaration of Rights. Also 42 U.S.C. sec. 2000 RUILPA." (Docket Entry # 1-1, p. 59).

14

On August 31, 2011, plaintiff Hudson filed a new grievance. (Docket Entry # 1-1, p. 35).  This grievance was virtually identical to plaintiff Brown's August 29, 2011 grievance. (Docket # 1-1, pp. 35 & 59).  Plaintiff Hudson, however, alleged that the violations complained of violated his "1st amendment rights and 4th amendment to the U.S. Constitution" in addition to all of the other rights listed in plaintiff Brown's grievance.  (Docket Entry # 1-1, pp. 35 & 59).

On September 7, 2011, plaintiff Colon filed an initial grievance with the DOC.  (Docket Entry # 1-1, p. 48).  Plaintiff Colon alleged his rights violated were as follows:

> 1. I am not being allowed to practice Al-Jumu'ah prayer, which is MANDATED by Allah (God) in the Holy Qur'an Sur'ah (Chapter) 62, Ayat (Verse) 9. 2. I am not being allowed to practice the observance of specific NOI Holy Days, such as: Saviours' Day, Independence Day, The Honorable Elijah Muhammad's, & the Holy Day of Atonement. 3. I am not allowed adequate space and time for video observance of the Honorable Minister Louis Farrakan's lectures, Study Group of T.H.M.L.F's Study Guides, religious training, & Holy Qur'an and Bible study classes. 4. I am not [being] allowed adequate access to a full-time Minister for consultation, guidance, & lessons.

(Docket Entry # 1-1, p. 48).  Plaintiff Colon continued that, "I am only allowed a once-a-week main lecture class for 2 hours that is depriving me access to what has previously been stated." (Docket Entry # 1-1, p. 48).  On the same day, plaintiff Colon also addressed these same points in a letter to the "Grievance Coordinator."  (Docket Entry # 1-1, p. 53).

15

On September 9, 2011, plaintiff Hudson received notice from
Scannell that his August 31, 2011 grievance had been partially
approved.  (Docket Entry # 1-1, p. 35).  Scannell explained that
the NOI faith is listed in the handbook.  (Docket Entry # 1-1,
p. 35).  Scannell further explained which practices and holy
days the handbook recognized for the NOI faith.  (Docket Entry #
1-1, p. 35).  Scannell then told plaintiff Hudson, "If these
religious accommodations are insufficient, please be advised
that you must proceed with your religious accommodation request
by submitting your request in writing for review by the
Religious Services Review Committee who makes a recommendation
to the Commissioner who is the final decision maker with regard
to your request."  (Docket Entry # 1-1, p. 35).  Scannell also
pointed out that, "Attached to this reply is a blank copy of the
Inmate Religious Services Request Form that you must complete
and submit to your Director of Treatment to begin the religious
accommodation request process."  (Docket Entry # 1-1, p. 35).
The notice also stated that, "Denied grievances may be appealed
to the Superintendent within 10 working days of Institution
Grievance Coordinator's decision."  (Docket Entry # 1-1, p. 35).

On September 13, 2011, plaintiff Brown received notice from
Scannell that his grievance had been partially approved.
(Docket Entry # 1-1, p. 59).  Plaintiff Brown was informed of
the exact same rationale for the decision as plaintiff Hudson

16

had been informed of in plaintiff Hudson's September 9, 2011 partial approval notice. (Docket Entry # 1-1, pp. 35 & 59). Plaintiff Brown was also informed of the exact same process by which to proceed with additional religious accommodation requests that plaintiff Hudson had been informed of as well as of the right to appeal the decision to the superintendent within ten days. (Docket Entry # 1-1, pp. 35 & 59).

On September 13, 2011, plaintiff Hudson appealed the partial approval of his grievance filed on August 31, 2011. (Docket Entry # 1-1, p. 33). Plaintiff Hudson alleged, "None of the operating religious groups had to seek space & time through the religious committee." (Docket Entry # 1-1, p. 33). Plaintiff Hudson submitted that the "decision is left to the Superintendent per 103CMR471, regulations as recommended by the employed minister." (Docket Entry # 1-1, p. 33). Plaintiff Hudson continued that his earlier grievances were "arbitrarily denied even though NOI models are established at MCI-Norfolk & [Old Colony Correctional Center]." (Docket Entry # 1-1, p. 33). Plaintiff Hudson further alleged that his "Religious committee form was submitted before the April scheduled meeting yet this process has been obstructed by delay tactics & non submission of the request . . .." (Docket Entry # 1-1, p. 33). Plaintiff concluded that, "These practices are discriminatory and govern[ed] by [circular rationale] to consult the Minister,

[whose] professional advice is ignored."  (Docket Entry # 1-1, p. 33).

On September 28, 2011, plaintiff Hudson's September 13, 2011 appeal was denied by defendant Russo.  (Docket Entry # 1-1, p. 33).  Defendant Russo explained that she concurred with the earlier decision granting plaintiff Hudson a partial approval of his request.  (Docket Entry # 1-1, p. 33).

Also on September 28, 2011, plaintiff Colon's September 7, 2011 grievance was partially approved by Scannell.  (Docket Entry # 1-1, p. 48).  Just as plaintiff Hudson and plaintiff Brown had been, plaintiff Colon was informed that the NOI faith is listed in the handbook.  (Docket Entry # 1-1, p. 48).  Scannell highlighted the practices and holy days that the handbook recognized for the NOI faith.  (Docket Entry # 1-1, p. 48).  Plaintiff Colon was then informed, "If these religious accommodations are insufficient, please be advised that you must proceed with your religious accommodation request by submitting your request in writing for review by the Religious Services Review Committee who makes a recommendation to the Commissioner who is the final decision maker with regard to your request."  (Docket Entry # 1-1, pp. 48 & 49).  Further, plaintiff Colon was told, "Attached to this reply is a blank copy of the Inmate Religious Services Request Form that you must complete and submit to your Director of Treatment to begin the religious

accommodation request process." (Docket Entry # 1-1, p. 49). The notice explained that, "Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision." (Docket Entry # 1-1, p. 48).

On October 2, 2011, plaintiff Colon wrote a letter addressed to defendant Gelb, which plaintiff Colon deemed to be his appeal to the partial approval of his grievance filed on September 7, 2011. (Docket Entry # 1-1, p. 55). Plaintiff Colon alleged that the partial approval "danced around [this institution's] obligation by shifting the focus to the [handbook]." (Docket Entry # 1-1, p. 55). Plaintiff Colon then addressed defendant's Gelb having informed plaintiff Colon that he could submit a religious accommodation request in writing to the religious services review committee by saying, "This suggestion utterly ignored the fact that attached to my grievance was a March 21, 2011, letter addressed to Director of Treatment, Christine Larkin." (Docket Entry # 1-1, p. 55). Plaintiff Colon explained that the letter "specifically requested [additional] time and space in order to fulfill my religious practices." (Docket Entry # 1-1, p. 55).

Plaintiff Colon further averred that, "I shouldn't have to submit anything for review by the Religious Review Committee when I was allowed to meet the tenets of my faith while at Old Colony Correctional Center." (Docket Entry # 1-1, p. 55).

Plaintiff Colon alleged that all the other level four facilities in the state allow NOI "the necessary time and space for faithful observances." (Docket Entry # 1-1, p. 55). Plaintiff Colon stated that, "Per 103 CMR 471, the decision for time and space accommodations is left to the institution's superintendent." (Docket Entry # 1-1, p. 55). Plaintiff Colon further asserted that, "It's a crying shame that the [NOI] is the only religious sect that is being [referred] to some Religious Services Review Committee." (Docket Entry # 1-1, p. 55). Plaintiff Colon concluded the letter by affirming that he sought "the time and space to practice my Religious Requirements as a Registered member of the [NOI] . . .." (Docket Entry # 1-1, p. 55).

On December 8, 2011, plaintiffs filed the complaint. (Docket Entry # 1). Plaintiffs allege that, "At the time of the March 11, 2011 correspondence, Administrators Dinardo, Bruce Gelb and Lois Russo known or should had known that the Orthodox Muslim Imam had circulated a booklet castigating NOI Muslims as non-Muslims." (Docket Entry # 1, p. 4) (grammar in original). Plaintiffs also allege that, "A Fitnah disseminator was issued to Ms. Dinardo by Faradan Ibn Salahuddin to demonstrate that such a practice of castigating other Muslims is against all Islamic belief systems." (Docket Entry # 1, p. 4).

Plaintiffs continue that, "At the time of [plaintiff Hudson's] request for a [separate] Jumah . . . to both Program /Re-entry Director Chris Mitchell and Concord Administrators, these officials were aware that NOI Minister Randy Muhammad's faith was attacked as being non-Islamic . . .." (Docket Entry # 1, p. 4).  Plaintiffs submit that, "The Defendants' known or should had known that the Religious manual permitted NOI to have Jumah services and study group during the week . . .." (Docket Entry # 1, p. 5).  Plaintiffs allege that, "Ms. Larkin under . . . Dinardo's direction denied the space and time enlargement request . . .." (Docket Entry # 1, p. 4).  Plaintiffs also point out that "Luis Spencer is the acting Commissioner of the [DOC], who is responsible for the care and custody of Plaintiffs' . . .." (Docket Entry # 1, p. 2).

Plaintiffs further submit that, "The denial of NOI a full time Minister at the prison has led to the inability to observe Atonement and Saviours day nor one on one counseling or segreagtional rounds." (Docket Entry # 1, p. 7) (spelling in original).  Plaintiffs admit they "did not petition to religiously drill to the Religious Committee nor Concord Administrators due to the obstruction of their process attempts to secure their other Religious rights." (Docket Entry # 1, p. 7).

21

Despite not providing supporting documentation, plaintiffs also state that all "plaintiffs initiated individual grievances regarding the arbitrary denial of their religious rights to observe their religion equally afforded to other Religious Groups." (Docket Entry # 1, p. 6). Plaintiffs also allege that all "[plaintiffs] appealed this decision . . .." (Docket Entry # 1, p. 6).

In the complaint, plaintiffs further allege that by July of 2011, plaintiffs each filed an inmate religious services request form. (Docket Entry # 1, p. 5) (Docket Entry # 1-1, pp. 62 – 84). The forms reiterated and expanded upon the issues raised in all the grievances and appeals mentioned above. Additionally, through these forms plaintiff Hudson, plaintiff Lopez and plaintiff Mahon each sought "Bow tie, state jeans and blue shirt attire." (Docket Entry # 1-1, pp. 63, 74 & 81). Plaintiff Rock similarly sought "Bow ties – clip on." (Docket Entry # 1-1, p. 83). Plaintiff Hudson, plaintiff Lopez and plaintiff Mahon explained that, "It is mandatory that all NOI followers religious attire be suit, dress shirt, bow tie, and dress pants." (Docket Entry # 1-1, pp. 63, 74 & 81). Plaintiff Hudson, plaintiff Lopez and plaintiff Mahon further explained that, "It is apart of ther cleaningness stages in which re-inforces the postive changes and attitude to the support the rehabilitative process." (Docket Entry # 1-1, pp. 63, 74 & 81)

22

(spelling in original).  Plaintiff Hudson, plaintiff Lopez and plaintiff Mahon also each pointed to the mission statement of the DOC to support his attire request by stating that the department seeks "to create opportunities for positive behavioral change."  (Docket Entry # 1-1, pp. 63, 74 & 81).

In the complaint, however, plaintiffs point out that, "None of [plaintiffs] had been informed about the Religious Committee results or whether the forms had been processed."  (Docket Entry # 1, p. 5).  Plaintiffs explain that, "Each Plaintiff had been told by Ms. Larkin that she was unaware of the status of their request."  (Docket Entry # 1, p. 5).  Plaintiffs additionally acknowledge that, "Plaintiffs has not receive any response back from the Religious Committee nor know if MCI-Administrators had submitted their request to said committee."  (Docket Entry # 1, p. 6).

I.   <u>MOTION FOR JUDGMENT OR TO COMPEL ANSWER TO COMPLAINT</u>

As previously noted, in the motion for judgment by default or alternatively the motion to compel defendants to answer, plaintiffs argue that defendants' motion to dismiss does not constitute an "'original answer' to the original complaint" under Rule 7(a)(2), Fed. R. Civ. P. ("Rule 7(a)").  (Docket Entry # 38, p. 2).  Plaintiffs cite case law to assert that responsive pleadings under Rule 7(a)(2) "should be interpreted as only complaint, answer to complaint and reply."  (Docket

Entry # 38, p. 2).  Plaintiffs assert that, "Absent the answer
to complaint, Plaintiffs cannot assess Defendants present motion
to dismiss nor can this Court properly assess either responses
fairly."  (Docket Entry # 38, p. 2).  Plaintiffs then ask this
court to "enter a judgment of default against Defendants for
failure to answer the complaint or alternatively compell
Defendants to answer . . .."  (Docket Entry # 38, p. 1)
(spelling in original).

## DISCUSSION

Rule 7(a) states that, "Only these pleadings are allowed:
(1) a complaint; (2) an answer to a complaint; (3) an answer to
a counterclaim designated as a counterclaim; (4) an answer to a
crossclaim; (5) a third-party complaint; (6) an answer to a
third-party complaint; and (7) if the court orders one, a reply
to an answer."  Additionally, "A defendant must serve an answer:
within 21 days after being served with the summons and
complaint."  Fed. R. Civ. P. 12(a)(1)(A)(i).

Rule 12(a)(4)(A), Fed. R. Civ. P. ("Rule 12(a)(4)(A)"),
however, provides that, "Unless the court sets a different time,
serving a motion under this rule alters these periods as
follows:  if the court denies the motion or postpones its
disposition until trial, the responsive pleading must be served
within 14 days after notice of the court's action."  Here, under
Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), defendants

filed a motion to dismiss for "failure to state a claim upon which relief can be granted."  Therefore, defendants' motion altered the 21 day period in which a defendant must serve an answer by instead requiring defendants' responsive pleading within 14 days after notice of this court's decision on the motion to dismiss.

Case law fully supports the fact that Rule 12 motions can be made prior to a defendant filing an answer.  "The objective of Rule 12 is to eliminate unnecessary delay at the pleading stage by requiring the presentation of an omnibus pre-answer motion in which defendant advances every available Rule 12 defense."  Marcial Ucin, S.A. v. SS Galicia, 723 F.2d 994, 997 (1st Cir. 1983); see also Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 16 (1st Cir. 2013) ("In lieu of an answer, the [defendants] filed a joint motion to dismiss.  It was granted in part . . ."); Pilgrim Badge & Label Corp. v. Barrios, 857 F.2d 1, 3 (1st Cir. 1988) ("Rule 12 precludes 'a defendant who makes a preanswer motion under this rule from making a further motion . . .'").

One of plaintiffs' own cited cases even supports the fact that defendants can file pre-answer Rule 12, Fed. R. Civ. P. ("Rule 12") motions.  See Blanton v. Pacific Mutual Life Ins. Co., 4 F.R.D. 200, 207 (W.D.N.C. 1944) (affirming under Rule 12 that the filed "motion in itself deferred the filing of an

answer until at least ten[4] days after the motion was acted on"). Plaintiffs also rely upon Rekeweg v. Federal Mutual Ins. Co., 27 F.R.D. 431 (N.D.Ind. 1961).  Plaintiffs accurately cite the case which states that, "The term 'responsive pleading' should be interpreted in the light of Rule 7(a) of the Federal Rules of Civil Procedure which defines 'pleadings' as including only the Complaint, the Answer and the Reply."  Id. at 434.  Plaintiffs overlook that a Rule 12 pre-answer motion, which is not a responsive pleading itself, merely delays the time by which a responsive pleading is due.

In light of Rule 7(a) and Rule 12 as well as applicable case law, plaintiffs' request that this court either enter judgment by default against defendants or compel defendants to answer the complaint are predicated upon a misunderstanding of the Federal Rules of Civil Procedure.  Defendants' period to file a responsive pleading to the complaint is altered pursuant to Rule 12(a)(4)(A).  No such pleading is required until 14 days after this court makes a decision on the motion to dismiss.

II.  MOTION TO STAY

As previously noted, plaintiffs wish to stay consideration of the Rule 12(b)(6) motion to dismiss until a ruling of issues on plaintiffs' motion for judgment by default or judgment to

---

[4]   Rule 12 has since been amended by altering the response period from ten days to 14 days.

compel defendants to answer the complaint.  Having now recommended a denial of plaintiffs' motion for judgment by default or alternatively motion to compel, the motion to stay becomes moot.

"'A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (internal brackets omitted).  In a factually analogous case, "the motion to stay . . . noted that various motions were pending resolution by the district court and requested 'a stay on the arbitration proceedings until final adjudication is entered regarding motions . . ..'"  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 373 (1st Cir. 2011). "Accordingly, the motion to stay became moot . . . when the district court entered its final decision on the motions . . .." Id.  Here, plaintiffs' motion to stay is likewise moot because of the foregoing recommended decision on the motion for a default judgment or alternatively to compel defendants to answer.

III.  MOTION TO DISMISS

## STANDARD OF REVIEW

The standard of review for a Rule 12(b)(6) motion is well established.  To survive a motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate

27

a plausible claim to relief even if actual proof of the facts is improbable.  Bell Atlantic v. Twombly, 550 U.S. 544, 555-558 (2007).  While "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully."  Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks omitted).  "[A]ccepting as true all well-pleaded facts in the complaint and making all reasonable inferences in the plaintiff's favor," Id. at 64, the "factual allegations 'must be enough to raise a right to relief above the speculative level.'"  Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010).  Drawing reasonable inferences in plaintiffs' favor but eschewing reliance on "'bald assertions, . . . unsubstantiated conclusions,'"  Fantini v. Salem State College, 557 F.3d 22, 26 (1st Cir. 2009), and legal conclusions, see Dixon v. Shamrock Financial Corp., 522 F.3d 76, 79 (1st Cir. 2008) (rejecting "'unsupported conclusions or interpretations of law'" in reviewing Rule 12(b)(6) dismissal), the complaint sets out the following facts.

## DISCUSSION

Plaintiffs seek to dismiss the complaint for a variety of reasons.  One such reason is the failure to exhaust administrative remedies under the PLRA.  Plaintiffs did not file an opposition to the motion addressing defendants' arguments.

The PLRA requires plaintiffs to exhaust all available grievance remedies prior to filing suit on a federal claim. The statute provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). "Once within the discretion of the district court, exhaustion in cases covered by the PLRA is now mandatory." Porter v. Nussle, 534 U.S. 516, 524 (2002). "Unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter v. Nussle, 534 U.S. at 524). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. 81, 91 (2006). "[D]ismissal is the appropriate remedy" where, as here, a prisoner fails to exhaust his administrative remedies under the PLRA. Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002).

Furthermore, plaintiffs must have exhausted these administrative remedies to bring their state claims. "In 1999, the Massachusetts Legislature created an exhaustion requirement similar to that in the [PLRA]." Ryan v. Pepe, 845 N.E.2d 1136, 1138 (Mass.App.Ct. 2006). "Accordingly, 'both Federal and State

29

law now expressly require inmates to exhaust available grievance procedures before going to court.'" Duran v. Patrick, 2010 WL 2682414, at *4 (D.Mass. June 9, 2010) (internal brackets omitted).

The Massachusetts exhaustion requirement states that, "An inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E." Mass. Gen. Laws ch. 127, § 38F.  Moreover:

> The commissioner shall promulgate regulations to establish a fair, impartial, speedy and effective system for a resolution of grievances filed against the department, its officers or employees, by inmates who are committed to, held by or in the custody of the department in a state, county or federal correctional facility, or the Massachusetts treatment center.

Mass. Gen. Laws ch. 127, § 38E(a).  Further, "The department promulgated 103 Code Mass. Regs. §§ 491.01-491.23 (2001), inclusive, setting forth rules and procedures for resolving inmates' grievances." Ryan v. Pepe, 845 N.E.2d at 1138-39. "Inmates may process their grievance by obtaining an institution grievance form from those locations and staff persons designated by the Superintendent."  103 C.M.R. § 491.09(1).  "All grievances shall be forwarded to the Institutional Grievance Coordinator."  103 C.M.R. § 491.09(3)(c).  The Institutional Grievance Coordinator, upon reviewing the grievance, shall "provide the inmate a written explanation regarding the proposed

resolution or the reasons for the denial of the grievance."  103
C.M.R. § 491.10(1)(f).  "Denied grievances shall inform the
inmate of the right to appeal."  103 C.M.R. § 491.10(4).

An appeal must be filed with the Superintendent and "must
be filed within ten working days from receipt of a decision . .
.."  103 C.M.R. § 491.12(1).  "The Superintendent shall respond
to the grievant in writing within 30 working days from receipt
of the grievance."  103 C.M.R. § 491.12(3).  Additionally:

> If an inmate has a request for an item that is not on the
> list of approved religious articles, the inmate should
> submit his or her request to the Superintendent.  The
> Superintendent will forward the request with a
> recommendation to the Religious Services Review Committee .
> . . for review.  This committee . . . shall forward their
> recommendations to the Commissioner for his approval.

103 C.M.R. §  403.10(9).

In addition, "the DOC has issued [the handbook] to serve as
a 'tool and reference source for prison administrators and
inmates.'"  Cryer v. Clarke, 2012 WL 6800791, at *2, (D.Mass.
Sep. 7, 2012).  "In the absence of any evidence that the
handbook . . . violates any applicable statute or constitutional
provision, it is valid and in accord with relevant statutory and
regulatory authority."  Rasheed v. Comm'r of Corr., 845 N.E.2d
296, 309 (Mass. 2006).

"The Handbook contains, among other things, a list of
approved practices and religious items for each of the
recognized religions within the DOC."  Cryer v. Clarke, 2012 WL

31

6800791, at *2.  The handbook itself mirrors 103 Code of
Massachusetts Regulations section 403.10(9) by stating that,
"Inmates are required to submit Attachment A with all supporting
documentation to the Superintendent's designee."  (Docket Entry
# 32-2, p. 3).  The handbook further explains that, "The
Superintendent will then forward his/her recommendation to the
Religious Services Review Committee . . .."  (Docket Entry # 32-
2, p. 3).

Therefore, MCI Concord had administrative remedies
available to plaintiffs.  "The term 'available' in [the PLRA] is
used to acknowledge that not all prisons actually have
administrative remedy programs."  Alexander v. Hawk, 159 F.3d
1321, 1326 (11th Cir. 1998).  Further, "The Supreme Court
recently held that there is no futility exception under [the
PLRA]."  Putnam v. Winn, 441 F.Supp.2d 253, 255 (D.Mass. 2006)
(citing Woodford v. Ngo, 548 U.S. at 85).  Accordingly,
administrative remedies available to plaintiffs at MCI Concord
consisted of:  (1) filing an initial grievance with the
institutional grievance coordinator; (2) filing an appeal within
ten days after receiving the institutional grievance
coordinator's decision; and (3) making a request with the
superintendent which would be forwarded to the religious
services review committee for a final decision with regards to

the matter.  Plaintiffs must have exhausted each of these remedies prior to being able to file the complaint.

Even taken as true, the statement that plaintiffs each filed an initial grievance, an appeal of each grievance and an inmate religious services request form still leaves plaintiffs short of exhausting their administrative remedies with regard to the complaint.  Exhausting administrative remedies involves receiving a decision regarding any pending grievances, requests or appeals.  See Medina-Claudio v. Rodriguez-Mateo, 292 F.3d at 36 (rejecting argument that PLRA allows proceedings to continue while prisoner completes exhaustion).  Massachusetts "promulgate[d] regulations to establish a fair, impartial, speedy and effective system for a resolution of grievances . . .."  Mass. Gen. Laws ch. 127, § 38E(a).  At the same time, though, "Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  Porter v. Nussle, 534 U.S. at 525.  "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance."  Woodford v. Ngo, 548 U.S. at 95.  It follows that when administrative officials are processing a request, "because [the plaintiff's request] has not completed the administrative review process, his claim is therefore

unexhausted and must be dismissed."  Ford v. Clarke, 2011 WL 3816798, at *6 (D.Mass. Aug. 25, 2011).

In the complaint, plaintiffs allege that all plaintiffs filed inmate religious services request forms by July 2011. Plaintiffs, however, make no allegations that they received any kind of determination regarding their inmate religious services request forms.  In fact, plaintiffs state that, "None of [plaintiffs] had been informed about the Religious Committee results or whether the forms had been processed."  (Docket Entry # 1, p. 5).  By their own admission, plaintiffs are aware that a final decision with regards to their inmate religious services request forms had not been made and that the forms may not have even been processed yet.  Accordingly, no plaintiff exhausted his administrative remedies prior to filing the complaint.

It is therefore not necessary to address plaintiffs' remaining arguments in favor of dismissal.  "Because exhaustion of remedies is a prerequisite to any claim by a prisoner concerning conditions of confinement, under any legal theory, it is not necessary to address defendants' remaining contentions." Nilsson v. Massachusetts Dep't of Corr., 2011 WL 1235474, at *8 (D.Mass. March 30, 2011); see also Casanova v. Dubois, 289 F.3d 142, 147 (1st Cir. 2002) ("If, on the other hand, appellants have exhausted their administrative remedies, this court would then

need to consider numerous other complicated issues that have been raised in this case").

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[5] that the motion for judgment by default or alternatively the motion to compel plaintiffs to answer the complaint (Docket Entry # 38) be **DENIED.**  Also in accordance with the foregoing discussion, the motion to stay (Docket Entry # 39) is **DENIED** and this court **RECOMMENDS**[6] that the motion to dismiss (Docket Entry # 31) be **ALLOWED** and the complaint be dismissed without prejudice.


                              /s/ Marianne B. Bowler
                            **MARIANNE B. BOWLER**
                            Unites States Magistrate Judge

---

[5]   Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which the objection is made and the basis for such objection.  See Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.
[6]   See the previous footnote.